STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH LLP
Allan Steyer (State Bar No. 100318)
D. Scott Macrae (State Bar No. 104663)
Jill M. Manning (State Bar No. 178849)
One California Street, Suite 300
San Francisco, CA 94111
Telephone: (415) 421-3400
Facsimile:   (415) 421-2234
asteyer@steyerlaw.com
smacrae@steyerlaw.com
jmanning@steyerlaw.com

SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP
Todd M. Schneider (State Bar No. 158253)
Kyle G. Bates (State Bar No. 299114)
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
kbates@schneiderwallace.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| Jeffrey Davis, and Ericsson Broadbent on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> Qualcomm Incorporated, a Delaware Corporation, <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE UNFAIR COMPETITION LAWS, AND THE COMMON LAW OF UNJUST ENRICHMENT** <br><br> **(Jury Trial Demanded)** |

Plaintiffs, by and through their undersigned attorneys, bring this class action and allege as follows:

# I.    INTRODUCTION

1.    Plaintiffs are purchasers of cellular telephones and other cellular devices such as computer tablets.  In each such device, there is a modem chipset (also called a baseband processor), which allows the device to communicate and transmit voice and data across wireless networks controlled by carriers, such as Verizon or Sprint.  Plaintiffs bring this action against Defendant Qualcomm Incorporated ("Qualcomm") for its anticompetitive conduct in acquiring and maintaining its monopoly over the modem chipset market and abusing the intellectual property rights underlying this technology, and charging an excessive and unlawful royalty on cellular phones or devices incorporating such patents, with the result that each end-user purchaser of such phones or devices pays an inflated price.

2.    To communicate with an operator's network, a cellular device must contain a modem chipset that complies with cellular communications standards that the network supports.  Standard setting organizations ("SSOs") comprised of device and device component developers as well as others collaborate to set technology requirements to ensure mass interoperability among all system components.  Because a standard requires that devices utilize a specific technology, standard-compliant devices will, in some cases, infringe on certain patents for technology incorporated in the standard.  Such patents are called standard essential patents ("SEPs").  SEP holders benefit by obtaining licensing fees and royalties associated with use of their technology.  Given the power such standards may give SEP holders, before selecting a standard, SSOs consider various alternative technologies, and importantly, also require that the developers of these standards agree to license their technology on fair, reasonable, and nondiscriminatory ("FRAND") terms.  This ensures that competitors may use the technology rather than being excluded from the market, and device manufacturers may use the technology without being subjected to unreasonable terms.

3.     Qualcomm was one of the earliest developers of cellular technology, developing the technology underlying the Code Division Multiple Access ("CDMA") standard on which network carriers such as Verizon and Sprint relied.  It is the dominant producer of CDMA chipsets and holds the largest number of SEPs for CDMA technology. Having agreed to license its technology on FRAND terms, Qualcomm's technology has been incorporated into virtually every relevant cellular standard in the last several years.

4.     Qualcomm has not adhered to its FRAND promises, but has instead taken advantage of standard-setting processes to acquire and maintain monopoly control of the modem chipset market.  Beginning at least as early as 2008, Qualcomm, among other things, (1) refused to license, or alternatively imposed onerous restrictions on licenses of, its SEPs to competing chipset makers; (2) conditioned the supply of its CDMA chipsets on agreeing to Qualcomm's license agreements for its entire patent portfolio; (3) entered into exclusive deals with certain cellular phone manufacturers, such as Apple, Inc. ("Apple"); and (4) most onerously, ignored the requirements of SSOs to license its SEPs to patent users on FRAND terms to extract unreasonably high, unilaterally determined royalty payments.

5.     Plaintiffs and the class of persons they seek to represent have been harmed by paying supracompetitive prices for the telephones they purchased.  Qualcomm has now "parlayed its pioneering role in cellular technology into a patent-licensing business that generates most of its profits.  Qualcomm charges a royalty on nearly every smartphone made, whether or not the device uses its chips."[1]  Qualcomm admits in its Form 10-Q filed on June 29, 2016, with the Securities & Exchange Commission ("SEC") that "[r]oyalties are generally based upon a *percentage of the wholesale (i.e., licensee's) selling price of complete licensed products*, net of certain permissible deductions (including transportation, insurance, packing costs and other items)."  (Emphases added).  It typically charges makers of 3G devices—and 3G-compatible 4G models—up to 5% of their products' wholesale price—around $20 on a $400 phone.

---

[1] Don Clark, *Qualcomm's Main Profit Driver is Under Pressure*, The Wall Street Journal (Apr. 13, 2015), http://www.wsj.com/articles/qualcomms-main-profit-driver-is-under-pressure-1428967051.

6.     Qualcomm's anticompetitive conduct has been met with condemnation by regulators around the world.  On September 9, 2009, the Japanese Fair Trade Commission ("JFTC") issued a cease and desist order against Qualcomm because of the violation of its FRAND obligations.  On February 10, 2015, the Chinese National Development & Reform Commission ("NDRC") found that Qualcomm had abused its monopoly power and restricted competition in violation of the country's Anti-Monopoly Law, fining Qualcomm $975 million.  On December 21, 2016, the Korea Fair Trade Commission ("KFTC") fined Qualcomm $854 million (the largest fine in its history) for abuse of market dominance and anticompetitive conduct with respect to its licensing practices.

7.     Most recently, on January 17, 2017, the United States Federal Trade Commission ("FTC") filed an enforcement action against Qualcomm in this Court on January 17, 2017, challenging Qualcomm's unlawful maintenance of a monopoly in baseband processors, alleging Qualcomm has excluded competitors and harmed competition, resulting in the increased prices paid by consumers for cell phones and tablets.  *Federal Trade Commission v. Qualcomm Inc.*, Case No. 17-cv-00220 (filed N.D. Cal. Jan. 17, 2017).

8.     Plaintiffs bring this action on behalf of themselves and others similarly situated to recover for their injuries resulting from Qualcomm's violations of Sections 1 and 2 of the Sherman Act, as well as violations of state antitrust and consumer protection laws.  Plaintiffs seek monetary damages, injunctive relief, and any other available remedies to which they are entitled for Qualcomm's unlawful conduct.

## II.    PARTIES

### A.    Plaintiffs

9.     Plaintiff Jeffrey Davis ("Davis") is a resident of San Diego, California.  Davis purchased Samsung Galaxies for personal use and not for resale.

10.     Plaintiff Ericsson Broadbent ("Broadbent") is a resident of Massachusetts.  Broadbent purchased an iPhone 6 and an iPhone 7 for personal use and not for resale.

**B.   Defendant**

11.     Defendant Qualcomm is a Delaware corporation having its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.  Qualcomm develops, designs, licenses, and markets worldwide its digital communications products and services, primarily through its two main business segments: Qualcomm CDMA Technologies ("QCT") and Qualcomm Technology Licensing ("QTL").  QCT deals with equipment sales while QTL engages in licensing of patents and technology.  QCT, a wholly-owned subsidiary of Qualcomm, is operated by Qualcomm Technologies, Inc. ("QTI"), another wholly-owned subsidiary of Qualcomm.  QTL, a third wholly-owned subsidiary of Qualcomm, grants licenses or otherwise provides rights to use portions of Qualcomm's patent portfolio.

12.     Qualcomm has extensive offices and employees throughout this District, including in San Francisco, Santa Clara, and Alameda counties,[2] and regularly conducts business here. Many of its licensees are also located in this District.

## III.   JURISDICTION AND VENUE

13.     This action arises under Sections 4 and Section 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 16, for Defendant's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section Three of the Clayton Act, 15 U.S.C. § 3.  The Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1337.

14.     Plaintiffs also bring claims under state laws as set forth herein.  The Court has supplemental jurisdiction over these pendant state law claims under 28 U.S.C. §§ 1332(d) and 1367.

15.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and Qualcomm transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here.

---

[2] Qualcomm, *Offices & Facilities*, https://www.qualcomm.com/company/facilities/offices (last visited Jan. 16, 2017).

4

16.     Qualcomm is engaged in interstate commerce, and its activities, including those activities that form the basis of this Complaint, substantially impact interstate commerce.

17.     Millions of cellular devices were purchased at artificially inflated rates in this District in recent years.

## IV.    INTRADISTRICT ASSIGNMENT

18.     Pursuant to the Northern District of California's Civil Local Rule 3-2(c)-(e), the intradistrict assignment should be to the San Jose Division.  This action arises in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County.  Qualcomm has offices in Santa Clara and San Jose.  Third parties that have information relevant to this action, including leading cell phone manufacturers (also known as "original equipment manufacturers" or "OEMs") and Qualcomm competitors, also have offices in Santa Clara County. As noted above, the FTC filed a case in the San Jose Division concerning the practices at issue here.

## V.    FACTUAL BACKGROUND

### A.    SSOs, SEPs, and FRAND Obligations

19.     Interoperability and compatibility are critical for modern electronic devices. Although users may take for granted that their cellular devices will be able to connect wirelessly to their cellular network and the Internet, interoperability does not happen by chance.  Each component of a cellular network (such as those operated by AT&T, Verizon, and Sprint), and, by extension, each component of mobile wireless devices utilizing that cellular network, must work with other components, regardless of which company made each component.

20.     "Mobile wireless telephony" is the general term for describing the technology and equipment used in the operation of cellular telephones.  A cellular telephone contains a "modem chipset" (also called a baseband processor) – the core electronic unit that allows it to

CLASS ACTION COMPLAINT

transmit and receive information (either telephone calls or data) to and from the wireless network. Specifically, these chipsets transmit information, via radio waves, to cellular base stations. Base stations, in turn, transmit information to and from telephone and computer networks. It is essential that all components involved in this transmission of information be able to communicate seamlessly with one another.

21.     Because of the multitude of devices, device designers, component manufacturers, and others must agree to uniform standards to ensure the smooth operation of the cellular network and the cellular devices that connect to it. To achieve this, cellular network carriers, chipset manufacturers, cellular device manufacturers, and others have SSOs, such as the European Telecommunications Standard Institute ("ETSI"), the International Telecommunications Union ("ITU"), and the Institute of Electrical and Electronic Engineers ("IEEE").

22.     SSOs create standards and technical specifications and in doing so also declare patents that might be essential to those standards. The technology incorporated into a standard is typically chosen from among different options. Once incorporated and widely adopted, that technology is not always used because it is the best or the only option; it is used because the use of that technology is necessary to comply with the agreed-upon standard. Competition within that technology market is eliminated, as competing technologies are no longer available as alternative means of implementing the standard. Additionally, to implement a technological standard, devices often need to incorporate a patented invention on which the standard is based. These are the SEPs discussed previously. Holders of patents essential to technology incorporated into a standard declare their patents as SEPs. Consequently, manufacturers of products containing the patented technology generally need to license the SEP to be compliant with the applicable standard.

23.     Antitrust law recognizes that under certain circumstances, collaboration by industry participants can increase competition, innovation, product quality, and consumer choice. For example, in this context, collaboration allows consumers to have confidence that cellular devices bought from different manufacturers will operate with each other and with the

cellular network that they choose.  Similarly, common standards allow component manufacturers, carriers, and others in the industry to invest in technological advancement with confidence that their products will work with wireless networks.

24.     However, standards can pose challenges to OEMs and can involve tradeoffs for consumers.  For example, a company implementing standards in a product must use certain mandated technologies, even where many viable and perhaps even superior alternatives exist.  Once a standard is adopted, participants begin to make investments tied to the implementation of the standard.  Because these participants may face substantial switching costs in abandoning initial designs and substituting a different technology, an entire industry can become "locked in" to a standard.

25.     The adoption of SEPs into technological standards also enhances the potential for abuse by the patent owner.  "Patent hold-up" occurs when the holder of an SEP demands excessive royalties after companies are locked into using a standard.  Where standardized technologies are covered by patents, companies that choose to implement a standard have no choice but to license those patents (and accept the licensor's terms) or face a lawsuit if they use the technology without a license.  "Royalty stacking" arises when a standard implicates numerous patents.  These royalty payments "stack" on top of each other and, in turn, inflate the cost of the product to the consumer.  Royalty stacking can be a significant concern:

> The data show that royalty stacking is not merely a theoretical concern.  Indeed,…we estimate potential patent royalties in excess of $120 on a hypothetical $400 smartphone—which is almost equal to the cost of device's components.  Thus, the smartphone royalty stack across standardized and non-standardized technology is significant, and those costs may be undermining industry profitability—and, in turn, diminishing incentives to invest and compete.[3]

---

[3] Joseph J. Mueller & Timothy D. Syrett, *The Smartphone Royalty Stack: Surveying Royalty Demands for the Components within Modern Smartphones* (May 29, 2014), https://www.wilmerhale.com/pages/publicationsandnewsdetail.aspx?NewsPubId=171798724 41.

CLASS ACTION COMPLAINT

26.    To help alleviate these potential concerns, before agreeing to a particular standard, SSOs seek certain assurances from patent owners.  Specifically, SSOs ask SEP holders agreed to license their patents on fair, reasonable, and non-discriminatory terms, referred to as a SEP holder's FRAND obligations.  For example, the IEEE asks SEP owners to pledge that they will grant licenses to an unrestricted number of applicants on "reasonable, and nondiscriminatory" (or "RAND") terms.  If a patent holder does not choose to make this promise, the SSOs design a standard without using the patented technology.

27.    FRAND obligations are designed to, among other things, prevent SEP holders from wielding control over essential technology and restricting competition, development, and research related to the standard.  SEP holders generally agree to FRAND terms because SSOs may exclude technologies from the standard when a patent holder does not agree to FRAND terms.  SEP holders also benefit from license fees and royalties they gain from cooperating with the SSO.

28.    As the United States Court of Appeals for the Third Circuit has noted in one suit against Qualcomm:

> [A] standard, by definition, eliminates alternative technologies. When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology. Although a patent confers a lawful monopoly over the claimed invention, its value is limited when alternative technologies exist. That value becomes significantly enhanced, however, after the patent is incorporated in a standard. Firms may become locked in to a standard requiring the use of a competitor's patented technology. The patent holder's [intellectual property rights], if unconstrained, may permit it to demand supracompetitive royalties. It is in such circumstances that measures such as FRAND commitments become important safeguards against monopoly power.

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (citations omitted).

29.    When an SEP holder makes a FRAND promise to an SSO, implementers of the standard at issue and their customers are third-party beneficiaries of that promise.  FRAND obligations are more than a matter of a private contract between owners of technology, on the one hand, and SSOs and their other members (and implementers of the standard as intended

1    third party beneficiaries), on the other.  Instead, they are a critical precondition for antitrust

2    tolerance of the industry collaboration on which standard-setting depends.

3    **B.  The Cellular Industry and Qualcomm's Dominance and Abuse of Power**

4    30.    Wireless standards have evolved in distinct generations as consumers

5    demanded more features and the industry responded by developing new innovations.  The

6    following graphic, created by Qualcomm, shows the evolution of this technology[4]:



14    31.    For purposes of this case, following the first generation of cellular technology,

15    the cellular industry developed second generation ("2G") cellular technology, from which two

16    primary technology paths, or families of standards, emerged: (1) "CDMA," which stands for

17    "Code Division Multiple Access"; and (2) "GSM," which stands for "Global System for

18    Mobility."  CDMA is a channel access method used by various radio communication

19    technologies.  It provides multiple accesses, where several transmitters can send information

20    simultaneously over a single communication channel.  CDMA is used as the access method in

21    many mobile phone standards.  GSM is another digital mobile telephony system that is widely

22    used in Europe and much of Asia, other than Japan and South Korea.  It utilizes a variation of

23    time division multiple access.  Cellular telephone service providers operated under one or the

24    other path, with, for example, Verizon and Sprint operating CDMA-path networks, and

25    AT&T (formerly Cingular) and T-Mobile operating GSM-path networks.  The CDMA and

---

28    [4] Qualcomm, *The Evolution of Mobile Technologies-1g-2g-3g-4g-lte*, (June 2014),
https://www.qualcomm.com/media/documents/files/the-evolution-of-mobile-technologies-1g-to-2g-to-3g-to-4g-lte.pdf.

9

1   GSM technology paths are not interoperable; in other words, equipment and technologies

2   designed to be compatible with one standard cannot be used for the other standard.

3       32.    Mobile devices are configured for a particular carrier, like AT&T or Verizon,

4   and thus chipsets designed for a particular wireless device must conform to the standard

5   technology chosen for the carrier's associated network.  In other words, CDMA-based

6   networks demand chipsets that conform to the CDMA standard, and GSM networks require

7   chipsets that conform to the GSM standard.  As a result, chipsets that comply with a given

8   standard are not substitutes for chipsets that comply with other standards.  These chipsets

9   likewise have different price and demand characteristics.  Downstream consumers purchase

10  cell phones that include chipsets configured to operate using the standards chosen for a

11  particular network, and once purchased, those consumers are inextricably tied to that standard

12  for use of that device.

13      33.    Qualcomm pioneered the development of CDMA technology.  As a result, it

14  controlled, and continues to control, the market for such technology, initially selling 90% of

15  the chipsets that go into CDMA-compatible phones and continuing to control over 80% of the

16  market.  Additionally, Qualcomm amassed many patents related to this standard.

17  Consequently, virtually any company that makes CDMA products—be they chipsets, phones,

18  or infrastructure gear—has to obtain a license from Qualcomm.  Licensees pay a one-time fee

19  for access to the patent portfolio and then royalties based on the final product sold by the

20  licensee (*e.g.*, a smartphone).  Nearly all wireless companies have signed patent licenses with

21  Qualcomm.

22      34.    Qualcomm's royalty stream has continued in the technologies standardized in

23  third generation ("3G") cellular technology.  As with the prior generation of cellular

24  technology, 3G evolved into two competing standards—but this time, *both* major standards

25  were based on CDMA.  While an improved version of CDMA technology was developed, the

26  "Universal Mobile Telecommunications Service" ("UMTS") standard was also developed.

27  UTMS uses radio technology called WCDMA, which stands for "Wideband Code Division

28

10

1  Multiple Access." WCDMA technology allows for even further increased data speed and

2  capacity.

3       35.     The UMTS standard was adopted by the ITU, ETSI, IEEE, and other SSOs in

4  the United States and elsewhere after evaluating alternative available equipment and

5  technologies. Qualcomm supplies some of the essential technology that the ETSI included in

6  the UMTS standard and holds intellectual property rights ("IPRs"), such as patents, in this

7  technology. Among others, Qualcomm owns the essential patents for the WCDMA standard.

8       36.     CDMA-based technology has been adopted for *all* 3G wireless telephony and

9  broadband standards throughout the world. As a result, Qualcomm has reaped more than $50

10  billion in licensing revenues since 2000. Indeed, Qualcomm charges a royalty on nearly

11  every smartphone made, whether or not the device uses its chips.

12       37.     ETSI and other SSOs required a commitment from vendors whose

13  technologies are included in the CDMA and other CDMA-based standards to license their

14  technologies on FRAND terms. Qualcomm voluntarily and publicly agreed to accept

15  FRAND obligations.

16       38.     Indeed, in 2008, Qualcomm noted that it "has had a long standing policy of

17  broadly offering to license its standards essential patents for CDMA-based

18  telecommunications standards on terms and conditions that are fair, reasonable, and free from

19  unfair discrimination (FRAND), subject to reciprocity."[5] But in that same press release,

20  Qualcomm publicly stated that "FRAND embodies a flexible approach that allows individual

21  licensors and licensees to negotiate the terms and conditions that are best suited to address

22  their respective commercial objectives" and "FRAND does not, and never has, prescribed

23  formulas for imposing cumulative royalty caps or proportional allocations of such royalty

24  caps." By the time it released that statement in 2008, Qualcomm had licensed its patent

25  portfolios to more than 155 companies, making that portfolio the most widely licensed in the

26  industry. This public statement was false. As regulatory actions in multiple countries have

27

28  _____

[5] Qualcomm, *LTE/WiMax PATENT LICENSING STATEMENT* (Dec. 2008),
https://www.qualcomm.com/documents/ltewimax-patent-licensing-statement.

1    confirmed, Qualcomm has not abided by FRAND principles and its interpretation of FRAND

2    is not consistent with the obligations imposed on it by SSOs. Qualcomm's promises to

3    comply with its FRAND obligations induced the SSOs to adopt its technology in the cellular

4    technology standards relevant to this action. That conduct constituted deceit and fraud on the

5    SSOs and has injured Plaintiffs and others that have paid unreasonably high prices for cellular

6    devices as a result of Qualcomm's royalty demands.

7         39.     Qualcomm has abused its power over SEPs and the chipset supply to increase

8    its own dominance in these markets and charge exorbitant royalties. Simply put, it has abused

9    its involvement in the SSOs, which set standards around Qualcomm technology and gave it

10    the means to be as powerful as it has become. Qualcomm's manipulation of this unique

11    position is confirmed by multiple investigations of its conduct by trade and competition

12    agencies around the world, as discussed below.

13         40.     The fourth generation of cellular technology ("4G") brought with it the "LTE"

14    standard, which stands for Long Term Evolution of UMTS. Nearly all cellular-enabled

15    devices sold today support LTE for 4G service. LTE is an "orthogonal frequency division

16    multiple access" or "OFDMA"-based technology. The LTE standard does not implement

17    CDMA-based technologies.

18         41.     But like the UMTS technology before it, the arrival of LTE has not

19    significantly impacted Qualcomm's control over the chipset market or the power of its

20    licensing business. Qualcomm holds a leading and valuable patent portfolio that applies to

21    LTE technologies, including OFDMA, and over 90 companies (including LG, Nokia, and

22    Samsung) have royalty-bearing licenses under Qualcomm's patent portfolio for use in

23    OFDMA products (which do not implement any CDMA-based standards). Additionally,

24    many of the 4G-based cellular devices still implement CDMA technology to be backwards-

25    compatible with CDMA-based technologies that are still in use today. Qualcomm exclusively

26    supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA.

27

28

CLASS ACTION COMPLAINT

42.    Consequently, with its power over CMDA technology, Qualcomm can and does use this as leverage to gain a greater share of the LTE-chipset market.  The following chart, prepared by the KFTC[6], demonstrates how Qualcomm has used control over CDMA-based technologies to acquire more power and control over the LTE chipset market.

**\<Qualcomm's Market Share Trend in Modem Chipset Market per Standard (Based on Revenues)\>**

|         | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|---------|---------|---------|---------|---------|---------|---------|---------|---------|
| LTE     | -       | -       | 34.2%   | 58.8%   | 94.5%   | 96.0%   | 84.8%   | 69.4%   |
| CDMA    | 98.4%   | 97.6%   | 96.4%   | 94.3%   | 92.4%   | 93.1%   | 91.6%   | 83.1%   |
| WCDMA   | 38.8%   | 47.4%   | 45.7%   | 55.0%   | 50.4%   | 53.9%   | 48.8%   | 32.3%   |

* Source: Strategy Analytics

43.    In sum, Qualcomm holds a dominant position in the supply of chipsets that support CDMA, on which devices sold by Verizon and Sprint continue to depend.  It also holds a dominant position over the LTE-chipset supply.  Qualcomm has had at least a share of 80% or more of CDMA chipsets for many years, and Qualcomm's share of LTE chipsets sold was above 90% between 2012 and 2014, and remains above 60% percent today.  Qualcomm has leveraged its monopoly power over the supply of these chipsets to force device manufacturers into anticompetitive license agreements.  In other words, because these companies need CDMA- and LTE-based chipsets (controlled by Qualcomm) to be able to operate with CDMA- and LTE-based networks, device manufacturers have to accept unreasonable license terms as dictated by Qualcomm.  As one commentator noted: "Qualcomm's status as both a chipset and IP vendor provides them with unparalleled leverage to collect licensing fees at a lower cost, simply by denying physical delivery of the chipsets until all fees are paid."[7]

---

[6] Qualcomm has provided an unofficial translation of the KFTC's press release omn its website. *See* KFTC Issued Press Release Dated December 28, 2016 – Unofficial English Translation, https://www.qualcomm.com/documents/kftc-issued-press-release-dated-december-28-2016-unofficial-english-translation (last visited Jan. 15, 2017).

[7] Richard A. Taddonio, *Long – Qualcomm (NASDAQ: QCOM) - $68.42*, Columbia Business School 2015, https://www8.gsb.columbia.edu/valueinvesting/sites/valueinvesting/files/Taddonio_Richard-QCOM_0.pdf (last visited Jan. 16, 2017).

13

44.     Qualcomm also holds a dominant position in the SEP licensing market for its intellectual property relating to modem chipsets. Qualcomm has declared thousands of patents as essential to CDMA, UMTS (WCDMA), and LTE standards.  Consequently, OEMs are highly reliant on Qualcomm's SEP portfolio, because each CDMA-, UMTS-, and/or LTE-related SEP is indispensable and irreplaceable for such manufacturers.  Qualcomm thus controls the licensing market for SEPs for CDMA, UMTS (WCDMA), and LTE technologies because manufacturers could not produce 3G and 4G devices without risking Qualcomm's initiating patent infringement lawsuits or seeking injunctions.  Qualcomm uses its SEPs to require OEMs and others to license its entire patent portfolio, which includes non-SEPs as well.  Non-SEPs refer to the patents that are either not essential to the realization of the standard or replaceable in their functionalities through design-around or avoidance design. There is no requirement that non-SEPs be licensed on FRAND terms.  By putting both SEPs and non-SEPs into one license, Qualcomm avoids its obligation to set license terms on a FRAND basis.  In doing so, Qualcomm can charge excessive and unfairly high royalties to any licensees that were forced to accept the packaged patent licenses.

45.     Qualcomm's licensing division brings in the vast majority of its profits, as illustrated in the graph below.  As such, it is critical for Qualcomm to maintain its licensing and related terms which have made it so profitable.



CLASS ACTION COMPLAINT

46.     Qualcomm has structured its business to maintain that licensing power.  In 2007, Qualcomm claimed publicly that any manufacturers using CDMA and UMTS/WCDMA technology "ha[s] to take out a license from Qualcomm" and that Qualcomm had been "pretty consistent in that model."[8]

47.     Again in 2007, Qualcomm filed an *amicus* brief to the United States Supreme Court in which it described its licensing business model as follows:[9]

> Qualcomm has provided chipmakers nontransferable, worldwide, nonexclusive, restricted licenses to its portfolio of technically necessary patents through licensing agreements called ASIC [Application Specific Integrated Circuits] Patent License Agreements ("APLAs").  Chipmaker licensees typically pay Qualcomm an up-front license fee and a running royalty (paid quarterly) that is an agreed upon percentage of the defined Net Selling Price of the chips produced by the licensee. . . . An APLA provides the chipmaker-licensee with a license to *make* (or have made) its own ASICs.  An APLA also provides the chipmaker-licensee with a restricted license to *sell* ASICs, but only to handset makers that the APLA defines to be an "Authorized Purchaser" for incorporation into fully assembled handsets. Authorized Purchasers are those handset makers that themselves have a license from Qualcomm through their own Subscriber Unit License Agreement ("SULA") to make, use and sell fully assembled handsets that, in the absence of a SULA, would infringe Qualcomm's patents. Importantly, by their express terms, APLAs do *not* grant a license to the chipmaker to *use* the ASICs—i.e., licensed chipmakers may not themselves use or  pass on to others the right to use the chipmaker's ASICs to make, operate or sell handsets or any other product.  APLAs explicitly state that the rights to use the ASICs to make, operate or sell handsets are only conferred by licensing agreements between Qualcomm and Authorized Purchasers (i.e., by SULAs).  APLAs also expressly state that the license granted is only for the limited scope laid out, that no other license is granted or implied and that if the chipmaker-licensee sells ASICs to entities that are not Authorized Purchasers, the licensee has materially breached the APLA, which gives Qualcomm the right to terminate the agreement, including the license granted.
>
> As previously mentioned, producers of chips that are licensed through APLAs are granted, *inter alia*, a license to sell such chips only to handset makers that have entered into a SULA with Qualcomm.  The standard terms of the SULAs have granted handset makers a

---

[8] Qualcomm, Inc. at Jefferies Technology Conference (Oct. 2, 2007), at 5.

[9] Br. of Qualcomm Inc. as Amicus Curiae Supporting Respondent, *Quanta Comp., Inc. v. LG Elecs., Inc*., 533 U.S. 617 (2008) (No. 06-937), at 7-9.

1

2

3

4

> nontransferable, worldwide, nonexclusive, unrestricted license to Qualcomm's patents to *make* (and have made), import and *use* handsets, and to *sell* (and offer to sell) completed handsets. SULAs typically provide for an up-front licensing fee to be paid to Qualcomm, along with a running royalty (paid quarterly) that is set as a percentage of the Net Selling Price of the handsets sold.

5

6

7

48.     Even where Qualcomm sells its own chips, it requires purchasers to agree to its license agreements—which include the royalty rate based on the selling price of the device. As Qualcomm explained in its amicus brief:

8

9

10

11

12

13

> Qualcomm is also in the business of developing and selling its own chips and software for wireless handsets. Qualcomm typically sells chips only to those handset manufacturers that are licensed to Qualcomm's patents under a SULA. Such chip sales are pursuant to Components Supply Agreements, in which handset makers agree to pay Qualcomm an agreed upon price for the chips sold by Qualcomm. Components Supply Agreements provide that the buyer-handset makers may only incorporate the chips purchased from Qualcomm into fully assembled handsets that are the subject of the SULA.

14

15

Essentially, cellular devices today are unable to connect to their network without paying a royalty (between 3%-5% of the price of the entire device) to Qualcomm.[10]

16

17

18

19

20

21

22

49.     In short, the KFTC identified three abusive and anticompetitive practices by Qualcomm. *First*, it did not provide SEP licenses to competing chipset companies while threatening to sue them under those patents if they competed against Qualcomm in the sale of chipsets. *Second*, in selling baseband processors to OEMs like cellular phone makers, Qualcomm demanded the execution and performance of its license agreements, thus leveraging its SEPs improperly. And as a result, *third*, Qualcomm coerced cellular phone makers to accept unilateral onerous terms.

23

24

25

50.     The KFTC depicted this conduct in the graphic below[11]:

26

27

[10] *See also* Subscriber Unit License Agreement, SEC.gov, https://www.sec.gov/Archives/edgar/data/1092492/000119312504140764/dex103.htm (last visited Jan. 16, 2017).

28

[11] *See supra* note 6.

1

2

3

4

5

6

7

8

9

10



11    51.    Qualcomm's policy of not licensing SEPs to competing chipset makers while

12    insisting on licensing from cellular device manufacturers has entrenched its market power.

13    52.    Additionally, as OEMs cannot purchase chipsets from Qualcomm's

14    competitors without also paying royalties to Qualcomm, to avoid such royalties, in some cases

15    OEMs and other mobile device suppliers agree to deal exclusively or near-exclusively with

16    Qualcomm on the purchase of chipsets.  As the FTC explained in its complaint, since 2007,

17    Apple has entered into agreements to deal exclusively with Qualcomm in exchange for partial

18    relief from Qualcomm's standard royalties.  Samsung has also entered into a similar exclusive

19    dealing arrangement with Qualcomm.[12]

20    53.    Qualcomm's exclusive supply arrangement with these OEMs denies other

21    baseband processor suppliers the benefits of working with particularly important cell phone

22    manufacturers and hampers their development into effective competitors.

23    54.    As the KFTC explained, the size of the modem chipset market doubled since

24    2008, but Qualcomm's licensing practices caused no significant competitor to enter the

25    market and rather caused many existing competitors to exit it[13]:

26    ────────────────

27    [12] Joel Hruska, *Qualcomm may have inked exclusive deal to put Snapdragon 820 in Samsung hardware*, ExtremeTech.com (Dec. 21, 2015) https://www.extremetech.com/mobile/219791-qualcomm-may-have-inked-exclusive-deal-to-put-snapdragon-820-in-samsung-hardware.

28    [13] *See supra* note 6.



&lt;Market Growth Trend in the Modem Chipset Market and Market Exit by Major Chipset Companies&gt;

| Modem Chipset Maker | Exit (Imminent) Time |
|---|---|
| NXP | August 2008 |
| TI | October 2008 |
| Freescale | October 2008 |
| ST Micro | February 2012 |
| NEC | February 2014 |
| Broadcom | June 2014 |
| Ericsson | September 2014 |
| Nvidia | May 2015 |
| Marvell | September 2015 |

55.     The result has been a steady increase in Qualcomm's share of the chipset market[14]:

56.     This dominance in the chipset market, coupled with its ownership of critical SEPs built into several of the standards adopted by various SSOs, allowed Qualcomm to impose onerous license terms on cellular device manufacturers, including exorbitant royalties that were not the result of the FRAND process.

[14] *Id.*

18

57.    Qualcomm's royalty rates of 5% for most CDMA products and 3.25% for more recent LTE based products are significantly higher than others in the industry. The following chart demonstrates this in the LTE context:

| Company | Announced LTE Rates | No. of Essential LTE Patents |
|---|---|---|
| 1. Qualcomm | 3.3% | 350 |
| 2. Huawei | 1.5% | 182 |
| 3. Ericsson | 1.5% | 146 |
| 4. Nokia | 1.5% | 142 |
| 5. Nortel | 1.0% | 46 |
| 6. Siemens | 0.8% | 32 |
| 7. Motorola | 2.3% | 16 |
| 8. Alcatel | 2.0% | 9 |

**Source:** Stasik, Eric, "Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards," *les Nouvelles*, September 2010, p. 116.

58.    Qualcomm's rate base is also part of what makes Qualcomm's royalties so abusive.  Qualcomm admits that its "[r]oyalties are generally based upon a *percentage of the wholesale (i.e., licensee's) selling price of complete licensed products*, net of certain permissible deductions (including transportation, insurance, packing costs and other items)." (Emphases added).  Using the entire value of an end product is not a reasonable basis for calculating SEP-based royalties.  Indeed, on or around February 8, 2015, the IEEE and its Standards Association updated their licensing policy, stating that a reasonable royalty should be the value attributable to a SEP, excluding the value of that SEP's inclusion in an IEEE standard, and that a factor to consider when determining the reasonable rate is the value of the relevant functionality of the smallest salable compliant implementation that practices the essential patent claim.  Qualcomm's power and leverage allows it force licensees to pay excessive rates on an unreasonable rate basis, which results in a royalty divorced from the actual value attributable to its technologies and intellectual property.

59.    Qualcomm realizes the benefits of maintaining its licensing business and chipset business in one company, rejecting a push from an activist investor hedge fund to split the businesses into two companies.  "The strategic benefits of the current structure will best fuel Qualcomm's growth as we move through the upcoming technology transitions and

CLASS ACTION COMPLAINT

1    extend our technologies into new user experiences, services and industries," said Qualcomm's

2    CEO, Steve Mollenkopf.[15]

3    **C.    Regulators Investigate and Penalize Qualcomm's Abusive Conduct**

4        60.    While Qualcomm's abusive and unfair licensing practices have allowed it to

5    rake in billions of dollars in undeserved profits, these practices have not gone unnoticed by

6    courts and foreign and domestic regulatory agencies.  In the last few years, Qualcomm's

7    royalty calculations and licensing practices have come under scrutiny by competition

8    regulators of China, South Korea, Taiwan, Japan, Europe, and the United States.  As

9    described below, competition law enforcement authorities around the world have concluded

10   that, or are about to conclude that, Qualcomm's conduct as alleged herein is anticompetitive,

11   unfair, and injurious to consumers.

12       61.    For example, in November 2013, China's NDRC began to investigate

13   Qualcomm's SEP licensing practices.[16] On February 10, 2015, the NDRC found Qualcomm

14   (1) controlled the SEP Licensing Market and the CDMA, WCDMA, and LTE baseband chip

15   markets, and (2) abused that dominance by, among other things, charging excessive and

16   unfairly high royalties to any licensees that were "forced" to accept the packaged patent

17   licenses, the royalty rates of which were based on the wholesale net selling prices of smart

18   phones.  The NDRC found Qualcomm's conduct constituted violations of provisions of the

19   China Anti-Monopoly Law and, among other things, imposed a fine of eight percent of

20   Qualcomm's annual revenue within the territory of China for 2013—a $975 million fine.[17]  It

21   also ordered Qualcomm to materially lower the effective royalty by calculating its royalty not

22   

23   [15] Mike Freeman, *Qualcomm Rejects Breakup Plan*, Los Angeles Times (Dec. 15, 2015) http://www.latimes.com/business/la-fi-qualcomm-20151215-story.html.

24   [16] H. Stephen Harris, Jr., *An Overview of the NDRC Decision in the Qualcomm Investigation
25   July 2015*, CPI Antitrust Chronicle (July 2015), available at http://www.winston.com/en/thought-leadership/an-overview-of-the-ndrc-decision-in-the-
26   qualcomm-investigation.html.

27   [17] Qualcomm Press Release, *Qualcomm and China's National Development and Reform
     Commission Reach Resolution* (Feb. 9, 2015),
28   https://www.qualcomm.com/news/releases/2015/02/09/qualcomm-and-chinas-national-development-and-reform-commission-reach.

1   based on the total wholesale price of the device, but by calculating its royalty at 65 percent

2   (65%) of the net selling price.[18]

3       62.     In July of 2009, the KFTC fined Qualcomm for abusing its dominant share of

4   the chipset market and the SEP license market.[19]  The $207 million fine was the largest the

5   KFTC had then ever imposed on a company.  Undeterred by this fine, Qualcomm doubled

6   down on its unlawful conduct.  In December of 2016, the KFTC issued a decision imposing

7   its largest fine for Qualcomm's monopolistic conduct, and to mandate changes to

8   Qualcomm's business model.  Among other things, the KFTC found that Qualcomm had

9   coerced patent license agreement from handset companies while holding hostage the supply

10  of chipsets.  In other words, "Qualcomm actually used the threat of terminating the supply of

11  modem chipsets as **negotiation leverage** in the process of license negotiations with handset

12  companies." (Emphases in original).[20]  The KFTC found Qualcomm's control over the chipset

13  market "is a structure under which handset companies have to bite the bullet and accept

14  Qualcomm's license terms, even if they are unfair, because if the modem chipset supply is

15  suspended, handset companies would face the **risk** of their **entire business** shutting down."

16  (Emphases in original).

17      63.     Similarly, in December 2015, the Taiwan Fair Trade Commission ("TFTC")

18  notified Qualcomm of its investigation into the company's licensing behavior and among

19  other things, whether Qualcomm's royalty charges are unreasonable.[21]

20      64.     Most recently,  the FTC on January 17, 2017, filed an enforcement action in

21  this Court seeking a permanent injunction against defendant Qualcomm Incorporated to undo

22  and prevent its unfair methods of competition in or affecting commerce in violation of Section

23  _____

24  [18] *See supra* note 16.

25  [19] *See* Yoonhee Kim & Hui-Jin Yang*, A Brief Overview of Qualcomm v. Korea Fair Trade Commission*, CPI Antitrust Chronicle, (Mar. 2015)
    https://www.competitionpolicyinternational.com/assets/Uploads/KimYangMar-151.pdf.
26  [20] *See supra* note 8.

27  [21] Additionally, the European Commission ("EC") notified Qualcomm of its investigation in
    October of 2014.  The EC issued a Statement of Objections against Qualcomm in December
28  of 2015, which alleged that Qualcomm's practices harmed chipset competition and
    innovation.

5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).  FTC alleges, among other things, that (1) Qualcomm withholds its baseband processors unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm, including elevated royalties; (2) Qualcomm has consistently refused to license its cellular standard essential patents to its competitors, in violation of Qualcomm's FRAND commitments; and (3) Qualcomm entered into exclusive dealing arrangements with Apple Inc., which denied other baseband processor suppliers the benefits of working with a particularly important cell phone manufacturer and hampered their development into effective competitors.  *Id.*

**D.   Consumers are Harmed as a Direct Result of Qualcomm's Conduct**

65.    Qualcomm has abused its monopoly power to force device manufacturers and other licensees to pay excessively high royalties, among other things, which has directly resulted in harm to Plaintiffs and the Class because it resulted in them paying higher prices for their cellular devices than they would have in the absence of Qualcomm's conduct.

66.    Cellular devices are commodity products that consumers purchase as stand-alone products.  Consumers buy cellular devices either from the direct purchaser device manufacturer such as Samsung, or through their network carrier, such as Verizon and Sprint.

67.    Device manufacturers and network carriers are subject to vigorous price competition, and as a result, they do not absorb Qualcomm's unlawful royalties which are a percentage of the wholesale cost of the device itself, and instead pass along some, or all, of the excessive royalty to consumers.  For instance, chipsets, or baseband processers, cost as little as $10 to $13, but royalty demands associated with this component approach $60 for a $400 smartphone.[22]  This disparity between royalty demands and component costs results in an increased cost for the cellular device, which is directly passed on to the consumer.

68.    Ultimately, Qualcomm and Plaintiffs are all participants in the cellular device market.  Plaintiffs are consumers of such devices.  Qualcomm licenses technology essential to

---

[22] *See supra* note 2; *see also* Nomura 2012 Smartphone Guide http://www.patentoday.com/wp-content/uploads/2014/08/nomura_smartphone_poster_2012.pdf (last visited Jan. 15, 2017),

CLASS ACTION COMPLAINT

the operation of cellular devices and obtains monopoly rents tied directly to the entire wholesale price of the cellular devices at issue in this litigation. As a result, Qualcomm's anticompetitive acts, as alleged herein, directly distorted the price of the cellular devices paid by Plaintiffs. Indeed, Plaintiffs may not use the cellular devices at issue in this litigation without the licenses provided by Qualcomm.  In the absence of the licenses, as recognized by federal courts, Qualcomm has standing to sue any indirect users—not just direct infringers—of cellular devices infringing on its patent rights.

69.    As noted above, Qualcomm admits that "[r]oyalties are generally based upon a *percentage of the wholesale (i.e., licensee's) selling price of complete licensed products*, net of certain permissible deductions (including transportation, insurance, packing costs and other items)."  (Emphases added).[23]  The patent rights owned by Qualcomm are thus inextricably intertwined with the cellular devices themselves—and the effect of the anticompetitive conduct at issue in this case is targeted at the cellular device as a whole and not components thereof, as reflected by the royalty's derivation from the price of the cellular device as a whole.

70.    Plaintiffs and members of the Class have been forced to pay supra-competitive prices for cellular devices.  As Qualcomm licenses base royalties on "a percentage of the wholesale . . . selling price of a complete licensed product," purchasers of cellular devices are only one level removed from the unlawful overcharge at issue here.  Accordingly, this case will not involve complicated pass-through analysis in multiple and complex distribution chains.  *Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1098 (N.D. Cal. 2007).

71.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in such instances.  Two antitrust scholars—Professors Robert G.

---

[23] Calculating a royalty rate for a product component based on the price of the product as a whole is particularly imnappropriate and unfair.  *E.g.*, *Laser Dynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product.").

1    Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the

2    Haas School of Business at the University of California at Berkeley) and the late Lawrence A.

3    Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the

4    Handbook of the Law of Antitrust)—have observed that "in a multiple-level chain of

5    distribution, passing on monopoly overcharges is not the exception: it is the rule."[24]

6        72.    Similarly,  Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for

7    Information and Computer Science and Professor of Economics and Public Policy at the

8    University of Michigan), an economist who presented evidence in a number of indirect

9    purchaser cases involving Microsoft Corporation, said:

10           As is well known in economic theory and practice, at least some of the
11           overcharge will be passed on by distributors to end consumers. When
             the distribution markets are highly competitive, as they are here, all or
12           nearly the entire overcharge will be passed on through to ultimate
             consumers… This general phenomenon of cost pass through is well
13           established in antitrust laws and economics as well.

14        73.    If Qualcomm was forced to stop abusing its monopoly power and charge a fair

15    and reasonable royalty, consumers would receive better prices when purchasing cellular

16    devices.

17        74.    The precise amount of the overcharge impacting the prices of cellular devices

18    purchased by consumers is measureable through commonly accepted statistical and regression

19    modeling.

20

21    **VI.    MARKET DEFINITION**

22        75.    The relevant geographic market for purposes of this action is the United States

23    and its territories.

24        76.    The relevant product markets are: (1) the market for CDMA and premium LTE

25    modem chipsets ("Modem Chipset Market"), also known as baseband processors, which

26    allow cellular devices to communicate with carrier networks and (2) intellectual property

27

28    [24] RG Harris & LA Sullivan, *Passing-On the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. Pa. L. Rev. 269, 276 (1979).

1    rights associated with SEPs ("SEP Licensing Market").These two products will be referred to

2    collectively as the "Cellular Device Components."

3         77.    Qualcomm directly participates in the market for the sale of cellular devices to

4    Plaintiffs and Class Members by encumbering cellular devices through its licenses (and

5    related excessive royalties).  Specifically, Qualcomm's royalty payments are calculated as a

6    percentage of the wholesale price of the cellular devices, which in turn increases the retail

7    price of those devices.

8         78.    Plaintiffs purchase the Cellular Device Components when they buy a cellular

9    device.  Plaintiffs' injuries are inextricably intertwined with Qualcomm's anticompetitive

10   conduct with respect to chipset modems and abuse of patent rights because it has increased

11   the cost to them of buying cellular devices by, among other things, (1) eliminating

12   competition, allowing Qualcomm to charge supracompetitive prices for its chipsets and

13   licenses; and (2) forcing device manufacturers to agree to onerous licensing terms, including

14   excessive royalties.

15

16   **VII.   CLASS ACTION ALLEGATIONS**

17        79.    Plaintiffs bring this action on behalf of itself and as a class action under Rule

18   23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable, injunctive relief

19   and monetary relief under California law on behalf of the following class (the "Nationwide

20   Class"):

21           All persons and entities in the United States, who purchased, paid
         and/or provided reimbursement for some or all of the purchase price
22           for CDMA and/or premium LTE cellular devices ("Relevant Cellular
         Devices") from January 17, 2013 through the present.  This class
23           excludes: (a) Defendant, its officers, directors, management,
         employees, subsidiaries, and affiliates; (b) all federal and state
24           governmental entities except for those who have purchased Relevant
         Cellular Devices; (c) all persons or entities who purchased Relevant
25           Cellular Devices for purposes of resale or directly from Defendant; (d)
         any judges or justices involved in this action and any members of their
26           immediate families or their staff.

27

28

80.     Alternatively to the claim for nationwide monetary relief under California law, Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief pursuant to the common law of unjust enrichment and individual state antitrust, unfair competition, and consumer protection laws for each of the states listed below (the "Indirect Purchaser States")[25] on behalf of the following class (the "Damages Class"):

> All persons and entities in the United States, who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA-, and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2013 through the present.  This class excludes:  (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates;  (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices;  (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant;  (d) any judges or justices involved in this action and any members of their immediate families or their staff.

81.     The Nationwide Class and the Damages Class are referred to herein as the "Classes."

82.     While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are millions of members in each Class.

83.     Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Qualcomm's conduct to acquire and maintain monopoly power, which was and is generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

---

[25] The "Indirect Purchaser States" consist of Arizona, Arkansas, California, Colorado, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin. Broadbent has sent Qualcomm a written demand pursuant to Section 9(3) of Massachusetts General Law Chapter 93a and Plaintiffs will amend their complaint to include Massachusetts as an additional "Indirect Purchaser State" if Qualcomm fails to tender a reasonable and acceptable settlement of these claims.

84.    Whether Qualcomm possessed monopoly power over the Cellular Device Components in the United States during the Class Period;

85.    Whether Qualcomm willfully acquired or maintained monopoly power over the Cellular Device Components in the United States during the Class Period;

86.    Whether Qualcomm possessed monopoly power in the Modem Chipset Market (underlying the Cellular Device Components) in the United States during the Class Period;

87.    Whether Qualcomm attempted to possess monopoly power in the modem chipset market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

88.    Whether Qualcomm possessed monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period;

89.    Whether Qualcomm attempted to possessed monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period;

90.    Whether Qualcomm tied the sale of its CDMA- and premium LTE- based chipsets to the purchase of license rights to its patent portfolio (including SEPs and non-SEPs);

91.    Whether Qualcomm tied the sale of its SEPs with the purchase of its non-SEPs;

92.    Whether Qualcomm's acquisition and maintenance of its monopoly in the Cellular Device Components Market violated the Sherman Act, as alleged in the First Claim for Relief;

93.    Whether Qualcomm's acquisition and maintenance of its monopoly power in the Modem Chipset Market violated the Sherman Act, as alleged in the First Claim for Relief;

94.    Whether Qualcomm's acquisition and maintenance of its monopoly in the SEP Licensing Market (for licenses critical to the technology underlying cellular device market) violated the Sherman Act, as alleged in the First Claim for Relief;

95.     Whether Qualcomm's conduct violated California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, as alleged in the Second Claim for Relief;

96.     Whether Qualcomm's conduct violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Third and Fourth Claims;

97.     Whether the Qualcomm unjustly enriched itself to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Qualcomm, as alleged in the Fifth Claim for Relief;

98.     Whether the conduct of the Qualcomm, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

99.     The effect of Qualcomm's unlawful conduct on the prices of Relevant Cellular Devices sold in the United States and its territories during the Class Period;

100.     The appropriate injunctive and related equitable relief for the Nationwide Class; and

101.     The appropriate class-wide measure of damages for the Damages Class.

102.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Qualcomm's wrongful conduct in that they paid artificially inflated prices for purchases indirectly from Qualcomm.

103.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

104.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

105.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

106.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## VIII.   CLAIMS AND PRAYER FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Monopolization in Violation of Section 2 of the Sherman Act

107.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

108.    Qualcomm's conduct, as alleged herein, constitutes unlawful monopolization of the market for Cellular Device Components, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

109.    General antitrust principles apply to conduct involving intellectual property in the same way that they apply to conduct involving any other form of property.

110.    Market power is the ability to profitably maintain prices above, or output below, competitive levels for a significant period of time.  Monopoly power is the ability to control prices and exclude competition in a given market.  If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power.

111.    Qualcomm has monopoly power in the Modem Chipset Market.  First, it has maintained high and durable market shares in this market.  Qualcomm controls the CDMA

29

chipset supply, historically controlling over 90% of the CDMA modem chipset market and at the lowest point still controlling 83% of this market. Qualcomm also controls the Modem Chipset Market, controlling at relevant times up to 90% of the market, and today over 60% of the market. Qualcomm still exclusively supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA. Second, there are substantial barriers to entry. CDMA- and premium LTE- based technology is not interchangeable with or substitutable for other technologies, and adherents of this technology have become locked-in. Relatedly, Qualcomm controls the patents or SEPs underlying CDMA technology, and Qualcomm maintained this monopoly by, among other things, refusing to license to competitors and requiring purchasers of its chipsets to agree to its licenses for its patent portfolio. Third, and relatedly, Qualcomm's monopoly power is shown by Qualcomm's demonstrated ability to repeatedly force device manufacturers to accept one-sided, unreasonable supply terms. Among other things, Qualcomm has used its control over the CDMA chipset supply to require purchasers to agree to its license agreements and related terms, including excessively high royalties terms on an equal footing.

112.    Qualcomm also has monopoly power over the SEP Licensing Market. SSOs have selected standards based on technology for which Qualcomm owns the patents (based on the condition that Qualcomm would supply its technology on FRAND terms). As to market share, Qualcomm holds virtually all of the SEPS—the essential patents—for CDMA standard-based technologies, which underlie virtually all 3G devices and 4G-LTE devices which are 3G-compatible. Qualcomm has licensed its patent portfolio for 3G cellular devices to more than 200 licensees. As these patents are "essential" to the CDMA standard, other patents and patented technology cannot replace or serve as an alternative for Qualcomm's patents. Qualcomm's market power over the SEP Licensing Market is further demonstrated by Qualcomm's ability to leverage its control of its patents to force OEMs to agree to unfair and unreasonable license agreements and terms, including excessive royalties. Because OEMs need to use Qualcomm's technology for their devices to communicate with the major

1  carrier networks, they are forced to agree to Qualcomm's unfair and unreasonable licensing

2  terms.

3        113.   As indicated, Qualcomm has acquired and maintained of its market power in

4  the Cellular Device Components described above through anticompetitive means—among

5  other things, excluding competitors and forcing OEMs to agree to non-FRAND terms.

6        114.   Qualcomm holds market power over the Cellular Device Components Market

7  because it can encumber Relevant Cellular Devices with a royalty of its choice without other

8  firms competing to drive down these prices.  Specifically, Qualcomm's control over the

9  Cellular Device Components Market has allowed it to force license agreements on its

10  competitors and OEMs, and its license agreements allow Qualcomm to charge a licensing fee

11  plus ongoing royalties of between three to five percent (3-5%) of the wholesale price of the

12  completed device.  In other words, each Relevant Cellular Device sold with or based on

13  Qualcomm technology is also encumbered by Qualcomm's excessive royalties, which in turn

14  increase the cost of the device for consumers like Plaintiffs.

15        115.   There is no procompetitive justification for the anticompetitive conduct in

16  which Qualcomm has engaged.  Qualcomm induced SSOs to use its technology and related

17  patents in setting their standards on the promise that it would adhere to FRAND obligations.

18  In doing so, other alternative (and potentially superior) technologies were not utilized by

19  SSOs.  But Qualcomm has not met its FRAND obligations, and instead, has abused its

20  monopoly power in the Cellular Device Components Market to force OEMs into licenses with

21  unfair and unreasonable terms, including, but not limited to, excessively high royalty rates

22  based on the selling price of the completed device rather than the value of Qualcomm's

23  contribution to that device.  Qualcomm's acts have likely harmed the development of cellular

24  technologies, as it forced out competitors, thus reducing innovation and competitive pricing.

25        116.   Plaintiffs and the class were harmed as a direct result of Qualcomm's conduct,

26  which increased the purchase price of their relevant cellular devices.  Additionally,

27  Qualcomm's conduct harmed innovation and competition, which harmed Plaintiffs in the

28  quality and price of their relevant cellular devices.

1

**SECOND CLAIM FOR RELIEF**

2

**Nationwide Claim For Violation of the Cartwright Act,**

3

**Cal. Bus. & Prof. Code §§ 16700, *et seq*.**

4

117.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

5

118.    During the Class Period, Qualcomm engaged in monopolistic and

6

anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of

7

California Business and Professions Code sections 16700, *et seq*.  While Section 16700 does

8

not reach solely unilateral conduct by a monopolist, it encompasses agreements between a

9

monopolist and its customers where the monopolist effectively coerces the customer to accede

10

to the restraint in order to obtain the good or service that is the subject of the agreement. That

11

is what happened here.  Despite its FRAND obligations, Qualcomm unilaterally imposed

12

royalty rates that were unreasonable and exceeded what it could have obtained in a true

13

FRAND negotiation.  This conduct constitutes a "combination" under the Cartwright Act.

14

119.    Qualcomm established an unlawful scheme by which it acquired and

15

maintained monopoly power in the Modem Chipset Market and SEP Licensing Market

16

through anticompetitive means, including by excluding competition.

17

120.    The Relevant Cellular Devices are commodities.

18

121.    As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class

19

were overcharged when they purchased their Relevant Cellular Devices.

20

122.    It is appropriate to apply California antitrust law to the Nationwide Class.

21

Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as

22

OEMs that reside and do business in California to its unlawful conduct.  In doing so,

23

Qualcomm reaped a significant portion of its profits as a result of its unlawful scheme from

24

companies doing business in California.  Additionally, California is the most populous state in

25

the country, for which it was foreseeable that substantial number of California consumers

26

would be impacted by Qualcomm's unlawful behavior.

27

28

**THIRD CLAIM FOR RELIEF**

**Nationwide Claim For Violations of Unfair Competition Law,**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

123.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

124.    Qualcomm's conduct constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which protects consumers from illegal, fraudulent and unfair business practices.

125.    Plaintiffs bring this claim on behalf of themselves, the Damages Class, and on behalf of the public as private attorneys general pursuant to Cal. Bus. & Prof. Code § 17204.

126.    As discussed above, Qualcomm's conduct constitutes violations of the Sherman Act and the Cartwright Act.  As such, Qualcomm's acts constitute unlawful conduct under Cal. Bus. & Prof. Code § 17200, *et seq.*  Qualcomm unlawfully acquired and maintained its monopoly over the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio.

127.    Qualcomm's conduct was deceptive because it induced SSOs to use its technology on the promise it would comply with FRAND.  But after SSOs selected Qualcomm's technology for their standards, Qualcomm refused to comply with its FRAND promises.

128.    Qualcomm's conduct is unfair to Plaintiffs and members of the class because as a direct result of its acts described above, Plaintiffs were charged more for their Relevant Cellular Devices than they would have been but for Qualcomm's conduct.

129.    Plaintiffs and the class seek and are entitled to all forms of relief available under California's Unfair Competition Law. Pursuant to Cal. Bus. & Prof. Code  § 17203, Plaintiffs and the Damages Class seek from Qualcomm restitution and the disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by Qualcomm as a result of its conduct in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

130.     It is appropriate to apply California antitrust law to the Nationwide Class. Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as handset companies that reside in California to its unlawful conduct.  In doing so, Qualcomm reaped a significant portion of its profits as a result of its unlawful scheme from companies doing business in California.  Additionally, California is the most populous state in the country, for which it was foreseeable that substantial number of California consumers would be impacted by Qualcomm's unlawful behavior.

131.     Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs and the Damages Class seek an order of this Court enjoining Qualcomm from continuing to engage in the acts as set forth in this Complaint, which acts constitute violations of Cal. Bus. & Prof. Code § 17200 *et seq.*  Plaintiffs, the Class and the public will be irreparably harmed if such an order is not granted.

## FOURTH CLAIM FOR RELIEF

### Violations of State Antitrust and Restraint of Trade Laws

132.     Plaintiffs repeat the allegations set forth above as if fully set forth herein.

133.     In the event that the Court does not apply California law on a nationwide basis, Plaintiffs allege the following violations of state antitrust and restraint of trade laws in the alternative.

134.     Defendant Qualcomm's anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

135.     <u>Arizona</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected Arizona commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

136.   <u>California</u>: During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of California Business and Professions Code sections 16700, *et seq.*  While Section 16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement. That is what happened here. Despite its FRAND obligations, Qualcomm unilaterally imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation. This conduct constitutes a "combination" under the Cartwright Act.

137.   Qualcomm established an unlawful scheme by which it acquired and maintained monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive means, including by excluding competition.

138.   The Relevant Cellular Devices are commodities.

139.   As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their Relevant Cellular Devices.

140.   <u>District of Columbia</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of District of Columbia Code Annotated §§ 28-4501, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected District of Columbia commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

141.   <u>Illinois</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*).  During the Class Period, Qualcomm's illegal conduct substantially affected Illinois commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and

members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*). Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*).

142. <u>Iowa</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Iowa Code §§ 553.1, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553, *et seq.*

143. <u>Kansas</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Defendant has entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

144. <u>Maine</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*). During the Class Period, Qualcomm's illegal conduct substantially affected Maine commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are

1    threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

2    restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly,

3    Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat.

4    Ann. 10, §§ 1101, *et seq.*

5           145.   <u>Michigan</u>: Qualcomm's monopolization and anticompetitive conduct has

6    restrained trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

7    During the Class Period, Qualcomm's illegal conduct substantially affected Michigan

8    commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and

9    members of the Damages Class have been injured in their business and property and are

10   threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

11   restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly,

12   Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp.

13   Laws Ann. §§ 445.771, *et seq.*

14          146.   <u>Minnesota</u>: Qualcomm's monopolization and anticompetitive conduct has

15   restrained trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq.*  During the

16   Class Period, Qualcomm's illegal conduct substantially affected Minnesota commerce.  As a

17   direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

18   Damages Class have been injured in their business and property and are threatened with

19   further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

20   violation of Minnesota Stat. §§ 325D.49, *et seq.*  Accordingly, Plaintiffs and members of the

21   Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

22          147.   <u>Mississippi</u>: Qualcomm's monopolization and anticompetitive conduct has

23   restrained trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq.*  During the

24   Class Period, Qualcomm's illegal conduct substantially affected Mississippi commerce.  As a

25   direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

26   Damages Class have been injured in their business and property and are threatened with

27   further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

28

violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

148.   Nebraska: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

149.   Nevada: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

150.   New Hampshire: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* During the Class Period, Qualcomm's illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.*

1    Accordingly, Plaintiffs and members of the Damages Class seek all relief available under

2    New Hampshire Revised Statutes §§ 356:1, *et seq.*

3        151.    New Mexico: Qualcomm's monopolization and anticompetitive conduct has

4    restrained trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq.*  During the

5    Class Period, Qualcomm's illegal conduct substantially affected New Mexico commerce.  As

6    a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

7    Damages Class have been injured in their business and property and are threatened with

8    further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

9    violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members

10   of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

11       152.    New York: Qualcomm's monopolization and anticompetitive conduct has

12   restrained trade in violation of New York General Business Laws §§ 340, *et seq.*  During the

13   Class Period, Qualcomm's illegal conduct substantially affected New York commerce.  As a

14   direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

15   Damages Class have been injured in their business and property and are threatened with

16   further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

17   violation of the New York Donnelly Act, §§ 340, *et seq.*  Accordingly, Plaintiffs and members

18   of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

19       153.    North Carolina: Qualcomm's monopolization and anticompetitive conduct has

20   restrained trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*  During

21   the Class Period, Qualcomm's illegal conduct substantially affected North Carolina

22   commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and

23   members of the Damages Class have been injured in their business and property and are

24   threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

25   restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*  Accordingly,

26   Plaintiffs and members of the Damages Class seek all relief available under North Carolina

27   Gen. Stat. §§ 75-1, *et. seq.*

28

154.   North Dakota: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*.  During the Class Period, Qualcomm's illegal conduct substantially affected North Dakota commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

155.   Oregon: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.  During the Class Period, Qualcomm's illegal conduct substantially affected Oregon commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

156.   South Dakota: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. During the Class Period, Qualcomm's illegal conduct substantially affected South Dakota commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

157.   Tennessee: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq*.  During the

1   Class Period, Qualcomm's illegal conduct substantially affected Tennessee commerce.  As a

2   direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

3   Damages Class have been injured in their business and property and are threatened with

4   further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

5   violation of Tennessee Code Ann. §§ 47-25-101, *et seq*.  Accordingly, Plaintiffs and members

6   of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et*

7   *seq*.

8          158.    Utah: Qualcomm's monopolization and anticompetitive conduct has restrained

9   trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*.  During the Class Period,

10  Qualcomm's illegal conduct substantially affected Utah commerce.  As a direct and proximate

11  result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have

12  been injured in their business and property and are threatened with further injury.  By reason

13  of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Utah Code

14  Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiffs and members of the Damages Class

15  seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

16         159.    Vermont: Qualcomm's monopolization and anticompetitive conduct has

17  restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*.  During the Class

18  Period, Qualcomm's illegal conduct substantially affected Vermont commerce.  As a direct

19  and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

20  Damages Class have been injured in their business and property and are threatened with

21  further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

22  violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*.  Accordingly, Plaintiffs and members of

23  the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

24         160.    West Virginia: Qualcomm's monopolization and anticompetitive conduct has

25  restrained trade in violation of West Virginia Code §§ 47-18-1, *et seq*.  During the Class

26  Period, Qualcomm's illegal conduct substantially affected West Virginia commerce.  As a

27  direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

28  Damages Class have been injured in their business and property and are threatened with

41

1    further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

2    violation of West Virginia Code §§ 47-18-1, *et seq*.  Accordingly, Plaintiffs and members of

3    the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

4        161.    <u>Wisconsin</u>: Qualcomm's monopolization and anticompetitive conduct has

5    restrained trade in violation of Wisconsin Statutes §§ 133.01, *et seq*.   During the Class

6    Period, Qualcomm's illegal conduct substantially affected Wisconsin commerce.  As a direct

7    and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

8    Damages Class have been injured in their business and property and are threatened with

9    further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

10   violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiffs and members of the

11   Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

12       162.    Plaintiffs and members of the Damages Class in each of the above states have

13   been injured in their business and property by reason of Defendant's unlawful

14   monopolization.  Plaintiffs and members of the Damages Class have paid more for Relevant

15   Cellular Devices than they otherwise would have paid in the absence of Defendant's unlawful

16   conduct.  This injury is of the type the antitrust laws of the above states were designed to

17   prevent and flows from that which makes Defendant's conduct unlawful.

18       163.    In addition, Defendant has profited significantly from the aforesaid

19   monopolization.  Defendant's profits derived from their anticompetitive conduct come at the

20   expense and detriment of Plaintiffs and members of the Damages Class.

21       164.    Accordingly, Plaintiffs and members of the Damages Class in each of the

22   above jurisdictions seek damages (including statutory damages where applicable), to be

23   trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and

24   costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state

25   laws.

26                       **<u>FIFTH CLAIM FOR RELIEF</u>**

27               **Violation of State Consumer Protection Statutes**

28       165.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

42

166.    In the event that the Court does not apply California law on a nationwide basis,
Plaintiffs allege the following violations of state antitrust and restraint of trade laws in the
alternative.

167.    Defendant Qualcomm engaged in unfair competition or unfair,
unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer
protection and unfair competition statutes listed below.

168.    <u>Arkansas</u>: Defendant has monopolized through unfair, unconscionable, and/or
deceptive practices in violation of the Arkansas Code Annotated, § 4-88-101, et. seq.
Defendant knowingly agreed to, and did in fact, act in restraint of trade or commerce by
affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated
levels, the prices at which Relevant Cellular Devices were sold, distributed, or obtained in
Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the
Damages Class. The aforementioned conduct on the part of the Defendant constituted
"unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated,
§ 4-88-107(a)(10). Defendant's unlawful conduct had the following effects: (1) Relevant
Cellular Devices price competition was restrained, suppressed, and eliminated throughout
Arkansas; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized
at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages
Class were deprived of free and open competition; and (4) Plaintiffs and members of the
Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular
Devices. During the Class Period, Defendant's illegal conduct substantially affected Arkansas
commerce and consumers. As a direct and proximate result of the unlawful conduct of the
Defendant, Plaintiffs and members of the Damages Class have been injured in their business
and property and are threatened with further injury. Defendant has engaged in unfair
competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated,
§ 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all
relief available under that statute.

CLASS ACTION COMPLAINT

169.   <u>California</u>: Defendant has engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*  During the Class Period, Defendant manufactured, marketed, sold, or distributed Relevant Cellular Devices in California, and committed and continues to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code to obtain restitution from the Defendant for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The Defendant's conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendant, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendant's acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendant's acts or practices are unfair to purchasers of  Relevant Cellular Devices in the State of California within the meaning of Section 17200 of the California Business and Professions Code; and (4) Defendant's acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that

1  Defendant will not continue such activity into the future. The unlawful and unfair business

2  practices of Defendant, as described above, have caused and continue to cause Plaintiffs and

3  members of the Damages Class to pay supracompetitive and artificially-inflated prices for

4  Relevant Cellular Devices. Plaintiffs and members of the Damages Class suffered injury in

5  fact and lost money or property as a result of such unfair competition. The conduct of

6  Defendant as alleged in this Complaint violates Section 17200 of the California Business and

7  Professions Code. As alleged in this Complaint, Defendant has been unjustly enriched as a

8  result of its wrongful conduct and by Defendant's unfair competition. Plaintiffs and members

9  of the Damages Class are accordingly entitled to equitable relief including restitution and/or

10  disgorgement of all revenues, earnings, profits, compensation, and benefits that may have

11  been obtained by Defendant as a result of such business practices, pursuant to the California

12  Business and Professions Code, §§ 17203 and 17204.

13        170.   <u>District of Columbia</u>:  Defendant has engaged in unfair competition or unfair,

14  unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-

15  3901, *et seq*. Defendant agreed to, and did in fact, act in restraint of trade or commerce by

16  affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels,

17  the prices at which Relevant Cellular Devices were sold, distributed or obtained in the District

18  of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the

19  meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not

20  aware of Defendant's illegal conduct and were therefore unaware that they were being

21  unfairly and illegally overcharged. There was a gross disparity of bargaining power between

22  the parties with respect to the price charged by Defendant for Relevant Cellular Devices.

23  Defendant had the sole power to set that price and Plaintiffs and members of the Damages

24  Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the

25  Damages Class lacked any meaningful choice in purchasing Relevant Cellular Devices

26  because they were unaware of the unlawful overcharge and there was no alternative source of

27  supply through which Plaintiffs and members of the Damages Class could avoid the

28  overcharges. Defendant's conduct with regard to sales of Relevant Cellular Devices, including

1  their illegal conduct with respect to fixing the price of Relevant Cellular Devices at

2  supracompetitive levels and overcharge consumers, was substantively unconscionable

3  because it was one-sided and unfairly benefited Defendant at the expense of Plaintiffs and the

4  public.  Defendant took grossly unfair advantage of Plaintiffs and members of the Damages

5  Class. The suppression of competition that has resulted from Defendant's conduct has

6  ultimately resulted in unconscionably higher prices for purchasers so that there was a gross

7  disparity between the price paid and the value received for the Relevant Cellular Devices.

8  Defendant's unlawful conduct had the following effects: (1) Relevant Cellular Devices price

9  competition was restrained, suppressed, and eliminated throughout the District of Columbia;

10  (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at

11  artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the

12  Damages Class were deprived of free and open competition; and (4) Plaintiffs and members

13  of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular

14  Devices. As a direct and proximate result of the Defendant's conduct, Plaintiffs and members

15  of the Damages Class have been injured and are threatened with further injury.  Defendant has

16  engaged in unfair competition or unfair or deceptive acts or practices in violation of District

17  of Columbia Code § 28-3901, *et seq*., and, accordingly, Plaintiffs and members of the

18  Damages Class seek all relief available under that statute.

19       171.    <u>Florida</u>: Defendant has engaged in unfair competition or unfair,

20  unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair

21  Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendant's unlawful conduct had the

22  following effects:  (1) Relevant Cellular Devices price competition was restrained,

23  suppressed, and eliminated throughout Florida; (2) Relevant Cellular Devices prices were

24  raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3)

25  Plaintiffs and members of the Damages Class were deprived of free and open competition;

26  and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially

27  inflated prices for Relevant Cellular Devices. During the Class Period, Defendant's illegal

28  conduct substantially affected Florida commerce and consumers. As a direct and proximate

CLASS ACTION COMPLAINT

1    result of Defendant's unlawful conduct, Plaintiffs and members of the Damages Class have

2    been injured and are threatened with further injury. Defendant has engaged in unfair

3    competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et*

4    *seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available

5    under that statute.

6        172.    <u>Massachusetts</u>: Broadbent has sent Defendant a written demand pursuant to

7    Section 9(3) of Massachusetts General Law Chapter 93a and, if Defendant fails to tender a

8    reasonable and acceptable settlement of these claims, Plaintiffs will amend their complaint to

9    allege that Defendant committed unfair and deceptive conduct in violation of Massachusetts

10   General Law Chapter 93a.

11       173.    <u>Missouri</u>: Defendant has engaged in unfair competition or unfair,

12   unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising

13   Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.* Plaintiffs and members of the Damages Class

14   purchased Relevant Cellular Devices for personal or family purposes. Defendant engaged in

15   the conduct described herein in connection with the sale of Relevant Cellular Devices in trade

16   or commerce in a market that includes Missouri. Defendant agreed to, and did in fact affect,

17   fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which

18   Relevant Cellular Devices were sold, distributed, or obtained in Missouri, which conduct

19   constituted unfair practices in that it was unlawful under federal and state law, violated public

20   policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs

21   and members of the Damages Class. Defendant concealed, suppressed, and omitted to

22   disclose material facts to Plaintiffs and members of the Damages Class concerning

23   Defendant's unlawful activities and artificially inflated prices for Relevant Cellular Devices.

24   The concealed, suppressed, and omitted facts would have been important to Plaintiffs and

25   members of the Damages Class as they related to the cost of Relevant Cellular Devices they

26   purchased. Defendant misrepresented the real cause of price increases and/or the absence of

27   price reductions in Relevant Cellular Devices by making public statements that were not in

28   accord with the facts.  Defendant's statements and conduct concerning the price of Relevant

1    Cellular Devices were deceptive as they had the tendency or capacity to mislead Plaintiffs and

2    members of the Damages Class to believe that they were purchasing Relevant Cellular

3    Devices at prices established by a free and fair market. Defendant's unlawful conduct had the

4    following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed,

5    and eliminated throughout Missouri; (2) Relevant Cellular Devices prices were raised, fixed,

6    maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and

7    members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

8    and members of the Damages Class paid supracompetitive, artificially inflated prices for the

9    Relevant Cellular Devices. The foregoing acts and practices constituted unlawful practices in

10   violation of the Missouri Merchandising Practices Act.  As a direct and proximate result of

11   the above-described unlawful practices, Plaintiffs and members of the Damages Class

12   suffered ascertainable losses of money or property. Accordingly, Plaintiffs and members of

13   the Damages Class seek all relief available under Missouri's Merchandising Practices Act,

14   specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any

15   person of any deception, fraud, false pretense, false promise, misrepresentation, unfair

16   practice or the concealment, suppression, or omission of any material fact in connection with

17   the sale or advertisement of any merchandise in trade or commerce…," as further interpreted

18   by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et*

19   *seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the

20   relief sought in this count.

21        174.   <u>Montana</u>: Defendant has engaged in unfair competition or unfair,

22   unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade

23   Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§

24   30-14-201, *et. seq*. Defendant's unlawful conduct had the following effects:  (1) Relevant

25   Cellular Devices price competition was restrained, suppressed, and eliminated throughout

26   Montana; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized

27   at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages

28   Class were deprived of free and open competition; and (4) Plaintiffs and members of the

1   Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular

2   Devices. During the Class Period, Defendant marketed, sold, or distributed Relevant Cellular

3   Devices in Montana, and Defendant's illegal conduct substantially affected Montana

4   commerce and consumers. As a direct and proximate result of Defendant's unlawful conduct,

5   Plaintiffs and members of the Damages Class have been injured and are threatened with

6   further injury. Defendant has engaged in unfair competition or unfair or deceptive acts or

7   practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*, and,

8   accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

9   statute.

10      175.    <u>New Mexico</u>: Defendant has engaged in unfair competition or unfair,

11  unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1,

12  *et seq*. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting,

13  fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the

14  prices at which Relevant Cellular Devices were sold, distributed or obtained in New Mexico

15  and took efforts to conceal their agreements from Plaintiffs and members of the Damages

16  Class. The aforementioned conduct on the part of the Defendant constituted "unconscionable

17  trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia,

18  resulted in a gross disparity between the value received by Plaintiffs and members of the

19  Damages Class and the prices paid by them for Relevant Cellular Devices as set forth in

20  N.M.S.A., § 57-12-2E.  Plaintiffs and members of the Damages Class were not aware of

21  Defendant's illegal conduct and were therefore unaware that they were being unfairly and

22  illegally overcharged.  There was a gross disparity of bargaining power between the parties

23  with respect to the price charged by Defendant for the Relevant Cellular Devices. Defendant

24  had the sole power to set that price and Plaintiffs and members of the Damages Class had no

25  power to negotiate a lower price.  Moreover, Plaintiffs and members of the Damages Class

26  lacked any meaningful choice in purchasing Relevant Cellular Devices because they were

27  unaware of the unlawful overcharge and there was no alternative source of supply through

28  which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendant's

conduct with regard to sales of Relevant Cellular Devices, including their illegal conduct to fix the price of Relevant Cellular Devices at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendant at the expense of Plaintiffs and the public.  Defendant took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendant's conduct has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for the Relevant Cellular Devices. Defendant's unlawful conduct had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices . During the Class Period, Defendant's illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendant, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

176.   New York: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Relevant Cellular Devices were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendant made public statements about the prices of Relevant Cellular Devices that omitted material information that rendered the statements that they made materially misleading; and

1    Defendant alone possessed material information that was relevant to consumers, but failed to

2    provide the information. Because of Defendant's unlawful trade practices in the State of New

3    York, New York class members who indirectly purchased Relevant Cellular Devices were

4    misled to believe that they were paying a fair price for Relevant Cellular Devices or the price

5    increases for Relevant Cellular Devices were for valid business reasons; and similarly situated

6    consumers were potentially affected by Defendant's conduct. Defendant knew that their

7    unlawful trade practices with respect to pricing Relevant Cellular Devices would have an

8    impact on New York consumers and not just the Defendant's direct customers. Defendant

9    knew that their unlawful trade practices with respect to pricing Relevant Cellular Devices

10    would have a broad impact, causing consumer class members who indirectly purchased

11    Relevant Cellular Devices to be injured by paying more for Relevant Cellular Devices than

12    they would have paid in the absence of Defendant's unlawful trade acts and practices. The

13    conduct of the Defendant described herein constitutes consumer-oriented deceptive acts or

14    practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury

15    and broad adverse impact on the public at large, and harmed the public interest of New York

16    State in an honest marketplace in which economic activity is conducted in a competitive

17    manner. Defendant's unlawful conduct had the following effects: (1) Relevant Cellular

18    Devices price competition was restrained, suppressed, and eliminated throughout New York;

19    (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at

20    artificially high levels throughout New York; (3) Plaintiffs and members of the Damages

21    Class were deprived of free and open competition; and (4) Plaintiffs and members of the

22    Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular

23    Devices. During the Class Period, Defendant marketed, sold, or distributed Relevant Cellular

24    Devices in New York, and Defendant's illegal conduct substantially affected New York

25    commerce and consumers. During the Class Period, Defendant, directly, or indirectly and

26    through affiliates it dominated and controlled, manufactured, sold and/or distributed Relevant

27    Cellular Devices in New York. Plaintiffs and members of the Damages Class seek all relief

28    available pursuant to N.Y. Gen. Bus. Law § 349 (h).

177.   <u>North Carolina</u>: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendant agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Relevant Cellular Devices were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendant's conduct could not have succeeded absent deceptive conduct by Defendant to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendant's illegal activity. Defendant committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware.  Defendant's public statements concerning the price of Relevant Cellular Devices created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendant's illegal conduct. The conduct of the Defendant described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendant's unlawful conduct had the following effects:  (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices. During the Class Period, Defendant marketed, sold, or distributed Relevant Cellular Devices in North Carolina, and Defendant's illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, Defendant, directly, or indirectly and through affiliates it dominated and controlled, manufactured, sold and/or distributed Relevant Cellular Devices in North Carolina. Plaintiffs and members of the Damages Class seek actual damages

1    for their injuries caused by these violations in an amount to be determined at trial and are

2    threatened with further injury.  Defendant has engaged in unfair competition or unfair or

3    deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and,

4    accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

5    statute.

6          178.   <u>Rhode Island</u>: Defendant has engaged in unfair competition or unfair,

7    unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade

8    Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, *et seq*.) Members of this

9    Damages Class purchased Relevant Cellular Devices for personal, family, or household

10   purposes. Defendant agreed to, and did in fact, act in restraint of trade or commerce in a

11   market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at

12   artificial and non-competitive levels, the prices at which Relevant Cellular Devices were sold,

13   distributed, or obtained in Rhode Island. Defendant deliberately failed to disclose material

14   facts to Plaintiffs and members of the Damages Class concerning Defendant's unlawful

15   activities and artificially inflated prices for Relevant Cellular Devices. Defendant owed a duty

16   to disclose such facts, and considering the relative lack of sophistication of the average non-

17   business purchaser, Defendant breached that duty by their silence. Defendant misrepresented

18   to all purchasers during the Class Period that Defendant's Relevant Cellular Devices prices

19   were competitive and fair. Defendant's unlawful conduct had the following effects: (1)

20   Relevant Cellular Devices price  competition was restrained, suppressed, and eliminated

21   throughout Rhode Island; (2) Relevant Cellular Devices  prices were raised, fixed,

22   maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs

23   and members of the Damages Class were deprived of free and open competition; and (4)

24   Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

25   prices for Relevant Cellular Devices. As a direct and proximate result of the Defendant's

26   violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss

27   of money or property as a result of Defendant's use or employment of unconscionable and

28   deceptive commercial practices as set forth above. That loss was caused by Defendant's

willful and deceptive conduct, as described herein. Defendant's deception, including their affirmative misrepresentations and omissions concerning the price of the Relevant Cellular Devices, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Relevant Cellular Devices at prices set by a free and fair market. Defendant's affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Relevant Cellular Devices they purchased. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

179.    <u>South Carolina</u>: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq.*) Defendant's monopolization had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for the Relevant Cellular Devices during the Class Period. Defendant's illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

180.    <u>Vermont</u>: Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.* Defendant agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-

competitive levels, the prices at which Relevant Cellular Devices were sold, distributed, or obtained in Vermont. Defendant deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendant's unlawful activities and artificially inflated prices for the Relevant Cellular Devices. Defendant owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendant breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendant's Relevant Cellular Devices prices were competitive and fair. Defendant's unlawful conduct had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for the Relevant Cellular Devices.  As a direct and proximate result of the Defendant's violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendant's use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendant's willful and deceptive conduct, as described herein. Defendant's deception, including their affirmative misrepresentations and omissions concerning the price of Relevant Cellular Devices, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Relevant Cellular Devices at prices set by a free and fair market. Defendant's misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### SIXTH CLAIM FOR RELIEF

### Unjust Enrichment

181.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

182.     As a result of its unlawful conduct described above, Defendant Qualcomm has and will continue to be unjustly enriched.  Defendant has been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits related to the Relevant Cellular Devices.

183.     Defendant has benefited from its unlawful acts and it would be inequitable for it to be permitted to retain any of the ill-gotten gains resulting from its unlawful practices and the overpayments made by Plaintiffs and members of the Damages Class for Relevant Cellular Devices during the Class Period.

184.     Plaintiffs and members of the Damages Class are entitled to the amount of Defendant's ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct.  Plaintiffs and members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment that:

1.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.     That the unlawful conduct alleged herein constituted a violation of Section 2 of the Sherman Act, and the state antitrust and consumer protection laws set forth herein;

3.     Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state antitrust and consumer protection laws, and that a joint and several judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendant in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.      Defendant, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from committing any other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendant obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7.      Plaintiffs and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: February 6, 2017                              Respectfully submitted,


                                           By:   /s/ Allan Steyer
                                                 Allan Steyer

CLASS ACTION COMPLAINT

STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
Allan Steyer (State Bar No. 100318)
D. Scott Macrae (State Bar No. 104663)
Jill M. Manning (State Bar No. 178849)
One California Street, Suite 300
San Francisco, CA 94111
Telephone: (415) 421-3400
Facsimile:   (415) 421-2234
asteyer@steyerlaw.com
jmanning@steyerlaw.com
smacrae@bamlawlj.com

SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
Todd M. Schneider (State Bar No. 158253)
Kyle G. Bates (State Bar No. 299114)
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
kbates@schneiderwallace.com

*Attorneys for Plaintiffs*

58